**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| Eva M. Green, individually and on behalf of all other similarly situated | ) ) ) |
|     Plaintiff, | ) ) |
|     v. | )   No.  1:13-cv-418-SEB-MJD ) |
| Monarch Recovery Management, Inc., a Pennsylvania corporation, | ) ) ) |
|     Defendant. | ) |

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Eva M. Green ("Green"), individually and on behalf of all others similarly situated,[1] hereby responds to Defendant's Motion for Summary Judgment (Dkt. 127-128):

**INTRODUCTION**

The Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. ("FDCPA") *requires* debt collectors to make certain important disclosures to consumers, including, informing consumers of the name of the creditor to whom the debt is then owed, see, § 1692g(a)(2) of the FDCPA.  Defendant Monarch Recovery Management ("Monarch") sent Ms. Green a form debt collection letter which not only failed to tell her that the debt it was attempting to collect from her was owned by Interim Capital Group ("Interim"), but identified the wrong entity altogether, DHC Consulting Services ("DHC"), as the creditor

---

[1] Plaintiff's Motion for Class Certification (Dkt. 48) was denied (Dkt. 117) and Plaintiff has timely filed a Motion to Reconsider, which is fully briefed and remains pending (Dkt. 119, 126, 135). Thus, in her Response to Defendant's Motion for Summary Judgment, Plaintiff addresses both the individual and class claims brought in her Amended Complaint—Class Action.

to whom the debt was owed.  (Pl.'s SMF at ¶¶ 8-10).[2]

Additionally, the debt Monarch was attempting to collect was stale -- the statute of limitations on credit card debt in Indiana is six years, and Ms. Green's debt had been in default for more than seven years.  (Pl.'s SMF at ¶¶ 5, 8, 12, 25).  Courts have routinely found that attempting to collect debts that are time-barred violates the FDCPA, see, McMahon v. LVNV Funding, LLC, 744 F.3d 1010, 1022 (7th Cir. 2014).

Finally, it was well known to the creditor, Interim, that Ms. Green was represented by counsel in connection with the collection of her debts (Pl.'s SMF at ¶ 7), yet Monarch apparently had no procedure in place to obtain that information from its clients, and thus contacted a consumer that it knew, or should have known, was represented by counsel.

Incredibly Monarch now argues in support of summary judgment that:

1)  the very information Congress required debt collectors to disclose to consumers is immaterial (Dkt. 128, at pp. 15-17);

2)  its multiple-error-ridden handling of over 2,500 accounts, which included Ms. Green's debt, was merely "inadvertent" and "clerical" in nature, which shields it from liability by the FDCPA's bona fide error defense.  (Dkt. 128, at pp. 17-18).

Monarch's first argument does not pass a straight-face test.  Monarch's second argument is defeated by the undisputed evidence which demonstrates that Monarch had no systems or procedures in place to prevent the series of errors it committed in the collection of the portfolio of  2,500 debts which contained the debts of Ms. Green and the putative class.

---

[2] All citations to "Pl's SMF at ¶ _" refer to Plaintiff's Statement of Material Facts Not In Dispute, Dkt. 125 at pp. 2-8.

Monarch's arguments as to Ms. Green's individual claim fail as well.  Monarch claims that it had no *actual* knowledge that Ms. Green was represented by an attorney, but, as the creator of the account placement protocol, Monarch had the opportunity to require information about attorney representation, but it failed to bother to even ask. Monarch does not to now get to claim reward for its willful ignorance.

The simple fact is that, by failing to state the name of the actual creditor to whom the debt was owed, and by falsely stating that the creditor was another entity, Monarch violated of §1692g(a)(2) and §1692e of the FDCPA -- and these violations were both material, and plainly false, such that no extrinsic evidence is necessary.  Moreover, Defendant Monarch's attempt to collect a debt from Ms. Green which was time-barred, violated § 1692e(5) of the FDCPA.  Defendant's form debt collection letter clearly and unequivocally violated the FDCPA and summary judgment should be granted to Ms. Green for Defendant's violations of the FDCPA (see, Dkt. 124, 125).

### PLAINTIFF'S RESPONSE TO
### DEFENDANT'S STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 56-1(b), Plaintiff Green hereby responds to Defendant Monarch's asserted material facts:

1.      Sometime prior to 2006, Ms. Green opened a credit card account with Bank One. See page 37, at lines 10 through 25, and also page 38, at lines 1 through 12, of the deposition transcript of Eva Green, a copy of which is attached to the Appendix hereto as "Exhibit A."

**ANSWER:**    Agreed.

2.      Ms. Green was unable to make monthly minimum payments on this Bank One account, and it was eventually turned over to a collection agency. Exhibit A, pg. 40, 4-10; 21-24; pg. 41, 10-12.

**ANSWER:**    Agreed, that sometime in 2005, Ms. Green fell behind on paying

her bills, due to her husband's illness, including a debt she allegedly owed to Bank One,

see, Pl.'s SMF at ¶ 5.

3.      The Bank One account was referred to the Law Office of Sam Streeter, PLLC ("Streeter"), who was eventually sued for alleged violations of the FDCPA by Ms. Green, through her attorney, Steven J. Halbert. Exhibit A, pg. 41, 21-25; pg. 45, 17-19; pg. 46, 6-10.

**ANSWER:**    Agreed.

4.      While Ms. Green's lawsuit against Streeter eventually settled some time in 2006, that settlement did not affect the validity of the underlying debt with Bank One, and Ms. Green understood that, after her suit settled, she still owed Bank One that debt. Exhibit A, pg. 53, 8-25; pg. 54, 1-4; pg. 55, 9-24.

**ANSWER:**    Agreed.

5.      Ms. Green did not use the money from the Streeter suit's settlement to pay off this Bank One debt, instead opting to make no additional payments towards its outstanding balance.  Exhibit A, pg. 54, 14-22; pg. 55, 13-16.

**ANSWER:**    Agreed, but so what?  No one lawfully asked for payment from her

after that suit.  Moreover, Ms. Green used the settlement to pay for her necessary living

expenses, Dkt 128-1 at p. 54, lines 14-19.

6.      In 2010, Interim Capital Group, Inc. ("Interim") purchased a portfolio of debts that included Ms. Green's Bank One credit card debt. See page 23, at lines 5 through 21, of the deposition transcript of Karl Ryan, an excerpted copy of which is attached to the Appendix hereto as "Exhibit D."

**ANSWER:**    Agreed.

7.      In purchasing Ms. Green's Bank One debt, Interim was provided certain biographical information with respect to that particular account, as well as certain contact information for attorney Steven J. Halbert. Exhibit D, pg. 26, 6-25; pg. 27, 1-11.

**ANSWER:**    Agreed.

8.      That information, including Mr. Halbert's email address and telephone number, was eventually uploaded into Interim's collection management system. Exhibit D, pg. 29, 1-23; pg. 46, 15-20; pg. 48, 1-12.

**ANSWER:**    Agreed.

9.      Interim eventually transferred a number of accounts, including Ms. Green's, to DHC Consulting Services, LLC ("DHC"). Exhibit D, pg. 30, 2-8.

**ANSWER:**   Denied as the accounts were not transferred -- Interim only sent

some of its information on the accounts to DHC – the accounts were not "transferred",

see, Dkt. 128-4 at p. 30, lines 5-25.

10.     DHC is in the business of taking smaller debt buyers' respective portfolios, aggregating them, and sending them out to debt collectors. See page 11, at lines 19 through 24, of the deposition transcript of Dawn Horst, an excerpted copy of which is attached to the Appendix hereto as "Exhibit E."

**ANSWER:**   Agreed.

11.     During its transfer of Ms. Green's account to DHC, Interim did not include or provide any information or notice that Mr. Halbert may have represented Ms. Green. Exhibit D, pg. 30, 9-18.

**ANSWER:**   Agreed that in the blip of data for each account transferred to

DHC, such information was not included because neither DHC, nor Monarch, ever

asked for such information. Moreover, Ms. Green's attorney's name and e-mail was

right there in the account history.  Additionally, Ms. Green's prior lawsuit and her

representation by counsel was a matter of public record.  Nonetheless, Monarch never

requested information from DHC about the account history, prior lawsuits or attorney

representation and had no procedure or process in place to collect such information,

see, Dkt. 128-4 at p. 30, line 5-25

12.     In early February, 2013, DHC electronically sent a spreadsheet of approximately 2,500 accounts, including Ms. Green's Bank One account, to Monarch for collection. Exhibit D, pg. 12, 22-25; pg. 13, 1-3.

**ANSWER:**   Agreed.

13.     Monarch received this spreadsheet of accounts, or "placement" from DHC on February 7, 2013, and began the process of loading it into its system. See page 35,

at lines 12 through 18, of the deposition transcript of Diane Mazzacano, an excerpted copy of which is attached to the Appendix hereto as "Exhibit F."

**ANSWER:** Agreed.

14.     Due to a clerical error, this particular DHC placement was loaded incorrectly into Monarch's system by Diane Mazzacano. Exhibit F, pg. 76, 1-7; see also Monarch's supplemental answer to Plaintiff's interrogatories #16, a copy of which is attached to the Appendix hereto as "Exhibit G."

**ANSWER:** Agreed that this DHC placement was loaded incorrectly and

multiple mistakes were made, but disagree with the conclusion that the multiple errors

made by Diane Mazzacano in loading the spreadsheet constituted a "clerical error", <u>see</u>,

Pl.'s SMF, ¶¶ 13 - 25.

15.     Ms. Mazzacano was experienced with loading DHC placements, as she was responsible for "onboarding" DHC when it first came on as a client, meaning that she loaded its very first placement to ensure that the instructions that she subsequently drafted for use by Monarch's data processing department were accurate. Exhibit F, pg. 77, 9-19.

**ANSWER:** Disagree.  Ms. Mazzacano stated that she was <u>not</u> the individual

typically responsible for loading placements from DHC into the system and that DHC

frequently changed the format of its placement spreadsheets, <u>see</u>, Dkt. 128-6 at p. 76,

ln. 17 to p. 77, ln. 22.

16.     Ms. Mazzacano had loaded DHC placements on at least two occasions prior to February 7, 2013. Exhibit F, pg. 77, 9-19.

**ANSWER:** Agreed, but note that although Ms. Mazzacano loaded the first two

placement spreadsheets from DHC, this was in June of 2011 -- a year and a half prior to

the placement at issue-- and she did not recall whether she loaded any additional DHC

spreadsheets since the first two, <u>see</u>, Dkt. 128-6 at p. 76, ln. 17 to p. 77, ln. 22.

17.     On February 7, 2013, Ms. Mazzacano reviewed the "DHC Loading Placements" set of instructions prior to the placement's loading. Exhibit F, pg. 82, 4-10; pg. 84, 18-24; Exhibit G, #16.

**ANSWER:**   Denied.  She could not have "reviewed" the instructions because she failed to follow multiple steps, see, Pl.'s SMF at ¶¶ 13 – 25.

18.   While loading that DHC placement on February 7, 2013, Ms. Mazzacano missed two steps during the process, causing the accounts to be loaded to the wrong client code, which in turn resulted in the creditor on each and every one of the accounts to be improperly identified as "DHC Consulting Services, Inc." Exhibit G, #16.

**ANSWER:**   Agreed that Ms. Mazzacano missed at least two steps, but add that she missed a third step when she forgot to "decode" the letters DHC, which represented the name of another debt buyer, Ascension Services, see  Pl's SMF at ¶ 21.

19.   More specifically, Ms. Mazzacano did not correctly sort the DHC spreadsheet by owner name, which meant that separate text files were not created for the different portfolios, ultimately leading to each of the accounts being loaded in the system as unique client number "2502," or "DHC Consulting Services, Inc." Exhibit F, pg. 76, 8-14; pg. 95, 2-22.

**ANSWER:**   Agreed, adding that Ms. Mazzacano made an additional, third error, see, Pl's SMF, ¶ 21.

20.   When sending that information to a third-party letter vendor for the printing of collection letters, this clerical error would have thus caused those collection letters to identify the creditor as "DHC Consulting Services, Inc." Exhibit F, pg. 32, 3-13; pg. 34, 17-2; pg. 35, 1; Exhibit G, #17.

**ANSWER:**   Agreed, except to Defendant's conclusion that the multiple errors were "clerical" in nature, see, Pl's SMF, ¶ 21.

21.   In Ms. Green's case, this would have meant that the collection letter misidentified the creditor as DHC instead of Interim. Exhibit F, pg. 29, 9-22.

**ANSWER:**   Agreed that the letter sent to Ms. Green indentified DHC as the creditor to whom the debt was owed, see, Pl.'s SMF at ¶¶ 8-10.

22.   Some time in February of 2013, Ms. Green received a letter from Monarch on the delinquent Bank One debt. Exhibit A, pg. 20, 23-25; pg. 21, 4-22; Exhibit F, at its Exhibit 3.

**ANSWER:**   Agreed that Ms. Green received the letter from Monarch dated

February 8, 2013, <u>see</u>, Pl.'s SMF at ¶ 8 and Dkt. 125-1, but disagree that is was still a

Bank One debt -  the debt was owned by Interim, not Bank One, and it was no longer

owed, because it was time-barred, <u>see</u>, Pl.'s SMF at ¶¶ 8-10, 12, 22, 25.

23.     This collection letter advised Ms. Green that she owed a total balance of
$3,959.95 relative to her Bank One account, and that the creditor was DHC. Exhibit F,
at its Exhibit 3. The letter further instructed Ms. Green, if she were to make payment, to
make her check payable to "Monarch Recovery Management, Inc." Id. The letter also
contained Monarch's contact information and invited Ms. Green to write to dispute the
validity of the debt. Id.

**ANSWER:**   Agree that Ms. Green received the letter from Monarch dated

February 8, 2013, <u>see</u>, Pl.'s SMF at ¶ 8 and Dkt. 125-1, but disagree that is was still a

Bank One debt -  the time-barred debt was owned by Interim, not Bank One, <u>see</u>, Pl.'s

SMF at ¶¶ 8-10, 12, 22, 25.

24.     Prior to her receipt of the collection letter at issue, Ms. Green had never
even heard of DHC. Exhibit A, pg. 20, 11-14.

**ANSWER:**   Agreed.

25.     Upon her receipt of the collection letter, the identification of DHC as the
creditor meant nothing in particular to her. Exhibit A, pg. 67, 1-4.

**ANSWER:**   Agreed.  Ms. Green took the letter at face value to mean that the

debt was allegedly owed to DHC and that she did not know that the debt was owned by

Interim, since that information was nowhere to be found on Monarch's letter, <u>see</u>, Pl.'s

SMF at ¶¶ 8-10; Dkt. 125-1.

26.     Ms. Green immediately understood that, in sending the collection letter at
issue, Monarch was attempting to collect the delinquent debt owed on that same Bank
One credit card.  Exhibit A, pg. 64, 10-24.

**ANSWER:**   Agreed, but so what?  That statute requires the name of the current

creditor, not the name of the original creditor, see, 15 U.S.C. § 1692g(a)(2).

27.     There was nothing about Monarch's letter that was confusing to Ms. Green, and she understood it. Exhibit A, pg. 67, 10-25; pg. 68, 1-6; 18.

**ANSWER:**     Agreed, but so what?  The letter was false, not confusing.  Ms.

Green assumed that Defendant Monarch was truthfully stating that DHC owned the

debt, which as shown was not true, see, Pl.'s SMF at ¶¶ 8 – 10.

28.     Prior to this litigation, Ms. Green had never heard of Interim. Exhibit A, pg. 20, 8-10.

**ANSWER:**     Agreed.

29.     Monarch attempted to contact Ms. Green telephonically, and instead spoke with her husband, who relayed to his wife that people were calling her regarding a credit card debt. Exhibit A, pg. 26, 1-8; pg. 28, 12-25; pg. 29, 1-7.

**ANSWER:**     Agreed.

30.     Ms. Green subsequently called Monarch back on Thursday, February 28, 2013, and directed it to cease contact with her, and to instead contact her attorney, Steven Halbert. Exhibit A, pg. 27, 4-18; Exhibit F, pg. 41, 4-22.

**ANSWER:**     Agreed.

31.     During the duration of this lone telephone call with Plaintiff, Monarch did not engage in any abusive collection efforts; to the contrary, all the telephone call consisted of was Ms. Green providing Monarch's operator with Mr. Halbert's name and telephone number.  Exhibit A, pg. 68, 19-25; pg. 69, 1-23.

**ANSWER:**     Disagree. Monarch's collector insisted that Ms. Green tell her

whether she would be filing bankruptcy before agreeing to contact Mr. Halbert regarding

the debt, see attached Group Exhibit A, transcripts of telephone calls with Mr. and Mrs.

Green; see also, Dkt. 128-1at p. 26 at ln. 22 to p. 27 at ln. 18; p. 32, lns. 1-9; p. 72, lns.

3-10; p. 75, lns. 3-10; p. 76, ln 5 to p. 77, ln. 22.

32.     After Ms. Green provided Monarch with her attorney's contact information, Monarch never contacted her again. Exhibit A, pg. 71, 20-25; pg. 69, 1-23.

**ANSWER:**     Disagree. The call was her last contact with Monarch, but the call

did not end after Ms. Green provided her attorney's contact information, see, Exhibit A.

33.     Monarch never sued Ms. Green to collect on the debt at issue.

**ANSWER:**     Agreed, but so what?   The debt was time-barred and Monarch

does not own it, Pl.'s SMF at ¶¶ 9, 12, 25.

34.     Monarch's collection letter never threatened Ms. Green with a lawsuit.
Exhibit A, pg. 68, 19-24; Exhibit F, at its Exhibit 3.

**ANSWER:**     Agreed, but so what?   The letter's use of language regarding

"settlement" is misleading as to whether a debt is legally actionable, see, McMahon v.

LVNV Funding, LLC, 744 F.3d 1010, 1022 (7th Cir. 2014).

35.     As a result of Ms. Green's receipt of the collection letter at issue and her
lone telephone call to Monarch, Plaintiff claimed to have suffered from fatigue, an ulcer
flare-up, and irritability. Exhibit A, pg. 72, 3-8; pg. 73; 12-22.

**ANSWER:**     Agreed.

36.     Plaintiff self-diagnosed her feelings of fatigue as being related to the flare-
up of her pre-existing ulcer. Exhibit A, pg. 73, 12-22.

**ANSWER:**     Agreed that Ms. Green did not see a physician regarding her ulcer

flare-ups during Defendant's collection activities.  Once you are diagnosed with a

chronic condition, you learn to live with it and soldier on.  In the case of an ulcer, you

learn to avoid certain foods and eliminate stress.  One of Ms. Green's ways to reduce

stress was to turn the handling of the Bank One debt over to her attorneys, which

worked until Defendant committed its illegal collection actions.  Moreover, expert

testimony about physical and emotional stress is not required, see McCollough v.

Johnson, Rodenburg, & Lauinger, LLC, 637 F. 3d 939, 958 (9th Cir. 2011)(affirming a

jury's award of $250,000 in emotional damages for a collector's violations of the FDCPA

where no expert testified as to the emotional distress.).

37.     While Ms. Green was apparently diagnosed with an ulcer by a physician in either 2010 or 2011, she has not seen a physician or other medical professional for that particular condition since that date. Exhibit A, pg. 74, 7-10.

**ANSWER:**     Agreed, stating further, <u>see</u>, Pl.'s Resp. to ¶ 36.

38.     This ulcer is chronic in nature, and though it never abates, it may dull at times. Exhibit A, pg. 75, 10-11.

**ANSWER:**     Agreed, stating further, <u>see</u>, Pl.'s Resp. to ¶ 36.

39.     Ms. Green's ulcer flare-ups occur approximately six times per year, and can be caused by things such as her dietary choices. Exhibit A, pg. 74, 25; pg. 75, 1-7.

**ANSWER:**     Agreed, adding that Ms. Green's ulcers can also be caused by

stress and anxiety, and she testified that she had a bad one when she got Monarch's

letter, <u>see</u> Dkt. 128-1 at p. 73, ln. 21 to p. 75, ln. 25; stating further, <u>see</u>, Pl.'s Resp. to ¶

36.

40.     Ms. Green self-diagnosed one such ulcer flare-up to the receipt of the collection letter sent by Monarch. Exhibit A, pg. 72, 3-8; pg. 74, 8-9.

**ANSWER:**     Agreed, stating further, <u>see</u>, Pl.'s Resp. to ¶ 36 and ¶ 39.

41.     Ms. Green is not a medical professional; instead, for the last 13 years she has been employed as a customer services representative at Springfield Financial Services, a personal loan company specializing in personal lines of credit, mortgages, and other kinds of consumer loans.  Exhibit A, pg. 9, 8-25; pg. 10, 8-9.

**ANSWER:**     Agreed, stating further, <u>see</u>, Pl.'s Resp. to ¶ 36.

42.     Ms. Green never saw any medical professional for the flared ulcer or fatigue that she attributed to her receipt of the collection letter at issue and her telephone call to Monarch.  See Plaintiff's responses to Defendant's requests for production, at responses 6-13. A copy of said responses is attached to the Appendix hereto as "Exhibit B." See also Plaintiff's answers to Defendant's interrogatories, at answers 3; 5-7. A copy of those answers is attached to the Appendix hereto as "Exhibit C."

**ANSWER:**     Agreed, stating further, <u>see</u>, Pl.'s Resp. to ¶ 36.

43.     Ms. Green related her complained-of irritability to her husband's receipt of the initial call placed by Monarch, which alerted him to the fact that her Bank One credit

card debt still remained unpaid, irritating him and causing an argument between the Greens about Plaintiff's need to be better about paying her bills. Exhibit A, pg. 26; 4-8; pg. 28, 12-18; pg. 29,1-5; pg. 76, 9-25; pg. 77; 1-7.

   **ANSWER:**  Agreed, stating further, <u>see</u>, Pl.'s Resp. to ¶ 36.

   44.  Ms. Green missed no time from work as a result of her complained-of fatigue, ulcer, or irritability. Exhibit A, pg. 78, 2-5.

   **ANSWER:**  Agreed, stating further, <u>see</u>, Pl.'s Resp. to ¶ 36.

   45.  Pursuant to the Case Management Plan, if a party intended on using expert testimony in connection with a motion for summary judgment, those expert disclosures were to be served upon the opposing counsel no later than 90 days prior to the dispositive motion to deadline. See docket entry #82, ¶ G.

   **ANSWER:**  Agreed.

   46.  Therefore, pursuant to the Case Management Plan, Plaintiff was to disclose any expert testimony she planned on employing in connection with a motion for summary judgment on or before July 14, 2014. Id.

   **ANSWER:**  Agreed.

   47.  Plaintiff did not conduct consumer surveys as to whether or not the complained-of letter was confusing or misleading.

   **ANSWER:**  Agreed, stating further that survey evidence is not required if a statement in an attempt to collect a debt is plainly false or confusing, <u>see</u>, <u>Chuway v. National Action Financial Services.</u>, 362 F.3d 944, 948 (7th Cir. Ill. 2004); <u>Ruth v. Triumph Partnerships</u>, 577 F.3d 790, 801 (7th Cir. Ill. 2009); <u>Lox v. CDA, Ltd</u>, 689 F.3d 818 at 826 (7th Cir. 2012).

   48.  Plaintiff did not identify any expert witness that would provide testimony as to whether or not the complained-of letter was confusing or misleading.

   **ANSWER:**  Agreed.

   49.  Pursuant to the Case Management Plan, Plaintiff was to disclose the name, address, and vita of any expert witness, and was to serve Defendant with the report required by Rule 26(a)(2) of the Federal Rules of Civil Procedure on or before September 12, 2014. Id. at ¶ F.

**ANSWER:**    Agreed.

50.    Plaintiff did not identify any expert witness that would provide testimony establishing a causal connection between Plaintiff's receipt of the collection letter at issue or Plaintiff's telephone call to Monarch and a flare-up of her chronic ulcer or any resultant fatigue.

**ANSWER:**    Agreed, stating further, <u>see</u>, Pl.'s Resp. to ¶ 36.

## ARGUMENT

Defendant Monarch sent Ms. Green and the putative class an initial from debt collection letter which identified DHC as the creditor when, in fact, the creditor was Interim, and had never been DHC, <u>see</u>, Pl.'s SMF at ¶¶ 8-10.   Moreover, for Ms. Green and a putative subclass of 84, the letter was an illegal attempt to collect a time-barred debt <u>see</u>, Pl.'s SMF at ¶ 12, 22, 25.   Defendant's form debt collection letter clearly and unequivocally violated the FDCPA.   Defendant's motion should be denied and summary judgment in favor of Ms. Green and the putative class should be granted.

**I.    Defendant Monarch's False Statement Of The Name Of The Creditor Is A Material Violation of FDCPA §§ 1692g(a)(2) And 1692e.**

Defendant Monarch admits to sending Ms. Green an initial form debt collection letter, dated February 8, 2013, which wrongly identified DHC as the "Creditor" when, in fact, the actual owner of the debt was Interim, not DHC, <u>see</u>, Dkt. 128 at ¶¶ 6, 21. Defendant argues, however, that because Ms. Green understood that its letter was regarding a Bank One debt, extrinsic evidence is required to prove whether Monarch's misidentification of the creditor would confuse an unsophisticated consumer.   (Dkt. 128, pp. 12-13).   Defendant's argument demonstrates Plaintiff's point – her debt was <u>not</u> owed to Bank One, nor was it owed to DHC.   Pursuant to §1692g(a)(2) and §1692e of the FDCPA, Defendant Monarch had an affirmative obligation to clearly state who

actually did own her debt.  Defendant also claims that it is not liable for violations of §§1692g(2)(a) or 1692e, because the misidentification of the creditor was not material. (Dkt. 128, pp. 15-17).  Monarch's assertions, however, insofar as they relate to identification of the creditor, are entirely unsupported by case law.

### A. Defendant's False Statement Of The Name Of The Creditor Is A Clear Violation of §1692g of the FDCPA Such That Extrinsic Evidence Is Not Required.

Section 1692g(a)(2) of the FDPCA requires collectors, such as Defendant Monarch, to identify the creditor to whom a debt is owed, see, 15 U.S.C. §1692g(a)(2). Defendant Monarch's statement in its February 8, 2013 collection letter that DHC was the creditor when, in fact, Interim was the creditor, was plainly false -- no extrinsic evidence to this effect is necessary.  As has been widely held, the identification of the creditor is an essential component for a collection letter to comply with the FDCPA., see e.g., Braatz v. Leading Edge Recovery Solutions, 2011 U.S. Dist. LEXIS 123118 at [*2]-[*4] (N.D. Ill. 2011); Walls v. United Collection Bureau, 2012 U.S. Dist. LEXIS 68079 at [*5]-[*6](N.D. Ill. 2012); and Deschaine v. National Enterprise Systems, 2013 U.S. Dist. LEXIS 31349 (N.D. Ill. 2013); see also, Bourff v. Rubin Lublin, 674 F.3d 1238, 1241 (11th Cir. 2012).

Defendant, in a footnote, references a series of cases with §1692g violations which it alleges hold that extrinsic evidence is required (Dkt. 128, p. 12-13, n.1).  One of these cases, Chuway v. National Action Financial Services, 362 F.3d 944 (7th Cir. 2004), actually held that a clearly false or misleading statement in a collection letter does not require extrinsic evidence, see, Chuway, 362 F.3d at 948.  None of Defendant's other cited cases, however, include a dunning letter which falsely identified

14

the current creditor, see, Sims v. GC Services, 445 F.3d 959, 963 (7th Cir. 2006)(§ 1692g claim related to printing of the validation notice on the reverse side of the letter); McMillan v. Collection Professionals, 455 F.3d 754, 757 (7th Cir. 2006); Taylor v. Cavalry Investments, 365 F.3d 572, 575 (7th Cir. 2004); Durkin v. Equifax Check Services, 406 F.3d 410, 415, 419 (7th Cir. 2005), Marshall-Mosby v. Corp. Receivables, 205 F.3d 323, 326 (7th Cir. 2000), Johnson v. Revenue Mgmt. Corp., 169 F.3d 1057, 1060 (7th Cir. 1999), and Walker v. National Recovery, 200 F.3d 500, 501 (7th Cir. 1999)(alleged overshadowing of the required validation notice).   As all of these cases involve *confusing* rather than plainly false statements, their holdings as to the necessity of extrinsic evidence are irrelevant here.

      Moreover, the Chuway holding, that extrinsic evidence is not required for a clearly false statement, has been widely followed in the Seventh Circuit, see, Ruth v. Triumph Partnerships, 577 F.3d 790, 801 (7th Cir. 2009)("Not every meritorious FDCPA claim requires such extrinsic evidence, however; some collection notices are clearly misleading on their face. Cases involving plainly deceptive communications fall into a third category, one where we will grant summary judgment for the plaintiffs without requiring them to prove what is already clear."); Lox, 689 F.3d at 826 (Holding extrinsic evidence is unnecessary to illustrate confusion where a statement is plainly false or misleading).

      In Lox v. CDA, the collection letter stated:  "Our client may take legal steps against you and if the courts award judgment, the court could allow court costs and attorney fees.", see, Lox, 689 F.3d at 820-821.  Utilizing the test set forth in Ruth, the Seventh Circuit held that, because attorneys' fees could be assessed for the debts at

issue under <u>no</u> circumstance, the collector's statement was plainly false—the plaintiff did not have to provide extrinsic evidence that he or anyone else would be confused by the statement. <u>Lox</u>, 689 F.3d at 826.  In fact, the Court held that no extrinsic evidence was required as because the statement was plainly false and misleading -- even though the plaintiff testified that he knew was false.  <u>Lox v. CDA</u>, 689 F.3d at 820.

Defendant Monarch argues that Ms. Green was not confused by its letter because she knew that it was regarding her delinquent Bank One debt, and, consequently, extrinsic evidence that an unsophisticated consumer would be confused is required.  (Dkt. 128 at p. 12).  Ms. Green's knowledge of the original creditor, however, is entirely irrelevant to whether Defendant Monarch complied with §§1692g(a)(2) and 1692e -- the statute requires, instead, that she be told the name of the current creditor, Interim, whose name is wholly absent from Defendant's letter. Indeed, in her testimony, Ms. Green stated that she had <u>never</u> heard of Interim, let alone understood that it was the owner of her debt, <u>see</u>, Dkt. 128-1 at p. 20, lines 8-10.

Defendant Monarch's letter clearly violated both § 1692g(a)(2) and § 1692e of the FDCPA and no extrinsic evidence is needed to prove these unequivocal violations of the FDCPA.

### B.    Defendant Monarch's Failure To State The Name Of The Creditor Is A Material Violation of the FDCPA.

An initial collection letter's identification of the name of the creditor to whom a debt is owed is an essential component for compliance with the FDCPA, <u>see</u>, Dkt. 125 pp. 10-12.  Failing to identify the name of the creditor to whom a debt is owed violates §1692g(a)(2) of the FDCPA, <u>see</u>, <u>e.g.</u>, <u>Braatz</u>, 2011 U.S. Dist. LEXIS 123118 at [*2]-

[*4]; Walls, 2012 U.S. Dist. LEXIS 68079 at [*5]-[*6]; and Deschaine, 2013 U.S.Dist.

LEXIS 31349.  Indeed, as Judge Grady noted in Walls:

> We reject defendants' contention . . . that what plaintiff is complaining of is
> "immaterial" information.  The statue expressly requires identification of
> the creditor to whom the debt is owed; when that information is present in
> an arguably confusing manner, it could influence the consumer's decision.
> For example, it could cause an unsophisticated consumer to be concerned
> about the possibility of being defrauded or about paying the incorrect
> creditor and continuing to have outstanding debt.

Walls, 2012 U.S.Dist. LEXIS 68079 at [*5]-[*6]; see also, Bourff, 674 F.3d 1238, 1241

(11th Cir. 2012)("The identity of the creditor in these matters is a serious matter.").

Defendant's letter, which does not even contain the creditor's name and, instead,

contains the name of another entity, utterly fails to comply with §1692g(a)(2), and, by

falsely stating that DHC is the creditor, also violates §1692e.

Defendant Monarch, rather that address the holdings of Braatz and Walls --

which were both cited in Plaintiff's Amended Complaint (Dkt. 22) – wrongly relies on

cases which did not involve the failure to provide statutorily-required information --

none of the alleged falsities in these cases related to the important requirements of

§1692g(a). (Dkt. 128, pp. 15-16).[3]  Summary judgment should be granted in favor of

Ms. Green and the class as to Counts I and II of Plaintiff's Amended Complaint – Class

Action.

---

[3] Hahn v. Triumph Partnerships, 557 F.3d 755, 757 (7th Cir. 2009), held that a
collector's failure to itemize principal and interest was not material, so long as the total
amount of the debt was correct.  In Hegwood v. Lighthouse Recovery Assocs., 2012
U.S. Dist. LEXIS 27076, at *8 (N.D. Ind. Mar. 1, 2012), the district court held that, during
a call to a consumer at his place of work, the collector's false statement that prior
attempts to contact a consumer at home had been unsuccessful was not material.
Finally, Jensen v. Pressler & Pressler, LLP, 2014 U.S. Dist. LEXIS 59676, at *14-15
(D.N.J. 2014), held that a misstatement of the name of the Superior Court clerk on an
Information Subpoena, when, actually that specific clerk had retired, was immaterial.

### C. Monarch Did Not Maintain Procedures Reasonably Designed To Avoid The Multiple Errors Which Led To Its Misidentification Of The Creditor.

A debt collector relying on the <u>bona fide</u> error defense must show that the violation: (1) was unintentional, (2) resulted from a <u>bona fide</u> error, and (3) occurred despite the debt collector's maintenance of procedures reasonably adapted to avoid such error, <u>see</u>, <u>Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich</u>, 559 U.S. 573, 578 (2010); <u>Kort v. Diversified Collection Services</u>, 394 F.3d 530, 537 (7th Cir. 2005); <u>Jenkins v. Heintz</u>, 124 F.3d 824, 834 (7th Cir. 1997); <u>see also</u>, 15 U.S.C. §1692k(c).

In its Answer, as its first affirmative defense, Monarch baldly stated:

> 1.      To the extent Monarch has violated the Fair Debt Collection Practices Act (which is denied), such violation was the result of a bona fide error (15 U.S.C. § 1692k).

(Dkt. 57 at p. 20).  Monarch failed to provide a single fact to support this defense – no description of any procedures it maintained, whether reasonably adapted to avoid any error, let alone the errors that occurred here.

Indeed, only after much prodding, including a motion to compel (Dkt. 74, 95), did Defendant Monarch produce its "loading protocol" for DHC accounts, <u>see</u>, Dkt. 128, pp 17-18.  Monarch's loading protocol, however, does nothing more than verify that Monarch is collecting the correct dollar amount -- none of the procedures established in the loading protocol were meant to prevent errors, such as the multiple errors that occurred here, <u>see</u>, Pl.'s SMF at ¶¶ 13-21.

For example, Monarch could have requested that account aggregators, such as DHC, separate accounts into different spreadsheets by creditor.  Monarch could have implemented verification check boxes, such as are commonly used in software.  The

federal court system's CM/ECF Pacer system, requires that a filer click a box to verify that they have redacted personal information from documents being filed.  Here, Monarch could have set up a procedure which required whoever was loading accounts to "Click this box to verify that you sorted this spreadsheet by the name of the creditor and saved separate sheets for each creditor", etc..  Another possible procedure would have been for Monarch to perform a test run on a sample of its letters before sending them out to consumers, to verify that information was correct.  Monarch also could have simply had another person review the loading process, to ensure that all the steps were followed.  Monarch, however, took none of these precautions; the steps that Monarch actually took were in no way procedures reasonably adopted to prevent the multiple errors that occurred here – the complete failure to identify the current creditor.

To date, Defendant has failed to set forth any procedures it reasonably adopted to prevent the multiple errors it made which led to the misidentification of the creditor as "DHC" instead of "Interim", see, Pl.'s SMF ¶ 26.  Instead, Monarch attempts to minimize the numerous errors made in loading the placement spreadsheet at issue to a mere "clerical error", see, Dkt 128, pp. 2, 14, 16, 19.  The evidence shows, however, that none of Defendant's procedures would have prevented the multiple errors that occurred here – they simply were not adapted to do so, see, Pl.'s SMF ¶¶ 13-25.  In fact, this was no clerical error at all – it was a series of errors by Monarch's President, errors by the company itself.

Monarch's President made at least three errors in loading the placement that included the debts of Ms. Green and the putative class: 1) she forgot to sort the columns by the name of the creditor; 2) she forgot to create and save separate

spreadsheets for each creditor, and; 3) she forgot to reference the key code sent by DHC which would have indicated that the three-letter code DHC actually represented another debt buyer, Ascension Services, see, Pl.'s SMF ¶¶ 18-21.  Moreover, Monarch had absolutely no procedures in place to catch any of these errors -- Monarch failed to have any audit procedures to verify that account were correctly loaded – it only checks other information, unrelated to the name of the creditor, see, Pl.'s SMF at ¶ 19.  Indeed, Monarch only learned that the letters it sent to Ms. Green and the putative class, as well as the other consumers to whom it sent letters on about 2,500 accounts were wrong -- falsely stating the name of the creditor -- when it was served with Ms. Green's lawsuit.

Moreover, an error that was initially unintentional may become intentional if the collector fails to take corrective action after becoming aware of the error, see, e.g., Canady v, Wisenbaker Law Offices, P.C., 372 F.Supp. 2d 1379, 1384 (N.D.Ga. 2005)(rejecting a debt collector's bona fide error defense because it continued to pursue litigation in the wrong venue, even after it learned that venue was improper).  Here, Monarch ratified its errors by continuing to collect on the accounts, without ever bothering to notify these 2,500 consumers of its mistake, see, Pl.'s SMF at ¶ 20.  Therefore, Monarch is not entitled to the bona fide error defense.

## II.    Defendant's False, Illegal Attempts To Collect Time-Barred Debts Materially Violate FDCPA §1692e(5).

Section 1692e of the FDCPA prohibits collectors from making any false, deceptive or misleading representations in connection with the collection of a debt, including, making any false representations of the legal status of a debt, and §1692e(5) prohibits a collector from taking or threatening to take an action it cannot legally take, see, 15 U.S.C. §1692e(5).

The statute of limitations in Indiana for collecting delinquent credit card debts, pursuant to Indiana Code § 34-11-2-7(1), is six years from the date of the last activity, see, Smither v. Asset Acceptance, LLC, 919 N.E.2d 1153, 1158 (Ind. Ct. App. 2010). Moreover, as Defendant Monarch acknowledges (Dkt. 128, p. 14), pursuant to the Seventh Circuit's holding in McMahon v. LVNV Funding, LLC, a collection letter for a time-barred debt need not threaten a lawsuit in order to constitute a violation of FDCPA §1692e, see, McMahon v. LVNV Funding, LLC, 744 F.3d 1010, 1022 (7th Cir. 2014).

Defendant Monarch attempts to overcome the holding of McMahon by relying on three opinions which were all rejected by the McMahon[4] and argues that the McMahon holding, by using the word "could" in its assessment of whether such a letter would mislead an unsophisticated consumer, means that extrinsic evidence is required here. (Dkt. 128, p. 14).  Defendant is simply wrong -- its letter, offering Ms. Green a settlement on plainly time-barred debt, clearly violates § 1692e of the FDPCA.

A.   **The McMahon Holding Is In Accordance With Nationwide Legal Developments, Curtailing False, Abusive Debt Collection Of Time-Barred Debts.**

The Seventh Circuit's decision in McMahon is not an anomaly, but rather a part of a nationwide trend towards curtailing the misleading and abusive collection tactic of persuading consumers to make partial payments, thus restarting the statute of limitations on otherwise time-barred debts, see, e.g., New York City Local Rule 15, Codified as New York City Administrative Code, Section 20-493.2 (b)(adopted April 24, 2010)(attached as Exhibit B); Federal Trade Commission Report, "The Structure and

---

4 See, McMahon, 744 F.3d at 1015 at 1020-1021,which directly criticized the holdings in Rice v. Midland Credit Mgmt., 933 F.Supp. 2d 1040, 1044 (N.D. Ill. 2013), Huertas v. Galaxy Asset Mgmt, 641 F.3d 28, 33-34 (3d Cir. 2011), and Freyermuth v. Credit Bureau Services, 248 F.3d 767, 771 (8th Cir. 2001).

Practice of the Debt Buying Industry (FTC Report 2013)(attached as Exhibit C); Federal

Trade Commission Consent Decree, Case No. 8:12-cv-00182-T-27EAJ (M.D. Fl.

2012)(attached as Exhibit D); Goldsmith, T. E. & Martin, N. (2011). "Testing materiality

under the unfair practices acts: What information matters when collecting time-barred

debts?" Consumer Finance Law Quarterly Report, 64 (4), 372-381 (accessed online at

http:// ssrn.com/ abstract=1657040) (attached as Exhibit E).

     For example, the New York City Department of Consumer Affairs found that

collectors were soliciting partial payments in order to toll the statute of limitations, and

many consumers, unaware of the statute of limitations and its legal significance, were

being misled; as a result, New York City enacted Local Rule 15, which requires a notice

on all collection letters for time-barred debts, explaining the legal significance of the age

of the debt. see, Exhibit B, p. 4.

     Moreover, a scientific study published August 13, 2010 by the University of New

Mexico, found conclusively that notices such as the one required in New York City

impact consumers' decisions of whether to pay time-barred debts, see, Exhibit F, at pp.

20-22.  Later that year, New Mexico's Attorney General adopted a law requiring a

disclosure of the legal effect of a debt's time-barred nature in all collection

communications, see, Id., New Mexico Administrative Code 12.2.12.

     Indeed, the FTC has recommended, in its January, 2013 report on debt

collection, that if a collector knows or should know that it is collecting on a time-barred

debt, it must inform the consumer that (1) the collector cannot sue to collect the debt,

and that (2) providing partial payment would revive the collector's ability to sue to collect

the remaining balance, see, Exhibit C, at p. 47.  The FTC also secured a consent

decree with debt-buyer Asset Acceptance, requiring the company to disclose to consumers whether it knows or believes that a debt was incurred outside the limitations period, using this language: "The law limits how long you can be sued on a debt. Because of the age of your debt, we will not sue you for it", see, Exhibit D.

Defendant argues that word "could" in McMahon's holding indicates that extrinsic survey evidence is necessary to prove the misleading nature of such a letter.  (Dkt. 128, p. 14).  Read in its entirety, it is obvious that the McMahon Court believed the settlement offer on the time-barred debt was plainly misleading:

> Neither LVNV nor CMS gave a hint that the debts that they were trying to collect were vulnerable to an ironclad limitations defense. An unsophisticated consumer who read the dunning letter Delgado or McMahon received could have been led to believe that her debt was legally enforceable. **In other words, the letters misrepresented the legal status of the debts, in violation of the FDCPA …** We are inclined to defer to the agencies' [the FTC's] empirical research and expertise. If a consumer received an "offer for settlement" and searched on Google to see what is meant by "settlement," she might find the Wikipedia entry for "settlement offer." There she would learn that the term "offer to settle" is "used in a civil lawsuit to describe a communication from one party to the other suggesting a settlement—an agreement to end the lawsuit before a judgment is rendered."

McMahon, 744 F.3d at 1021 (internal citations omitted)(emphasis added).

Here, the debt that Defendant Monarch was attempting to collect from Ms. Green was plainly time-barred, yet Monarch's letter contained no explanation that Ms. Green could no longer be sued regarding the debt, see, Dkt. 125-1.  As New York City, New Mexico, the FTC, and the Seventh Circuit in McMahon have all concluded, collectors' failure to disclose information about the legal effect of the statute of limitations -- i.e., that a consumer may no longer be sued -- materially affect consumers' decisions about repayment.

Monarch's attempt, in its collection letter, to collect a time-barred debt from Ms.

Green without any such disclosure was materially false and/or misleading, in violation of §1692e of the FDPCA, and she does not need extrinsic evidence to prove that. Defendant's Motion for Summary Judgment as to Count III of Ms. Green's Amended Complaint -- Class Action should be denied.

**B.   Monarch Maintained No Procedures Whatsoever To Avoid The Collection Of Time-Barred Debts.**

Monarch does not, and simply cannot, allege that it maintained any procedures which were reasonably adapted to prevent attempts to collect debts barred by the statute of limitations, see, Pl.'s SMF at ¶¶ 23-25; Dkt. 128, pp. 17-18.  Moreover, Monarch's mistake of law as to which statute of limitations applied to the State of Indiana is not excused by the bona fide error defense, see, Jerman, 559 U.S. 573, 581 ("We have long recognized the 'common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally.'" (internal citations omitted)).  Defendants' attempts to collects debts which were time-barred by the statute of limitations is not excused by Monarch's ignorance of the applicable statute of limitations, and Defendant's Motion for Summary Judgment as to Count III of Plaintiff's Amended Complaint—Class Action, therefore should be denied.

**III.   The Undisputed Evidence Does Not Support Summary Judgment In Monarch's Favor As To Ms. Green's Individual Claims.**

Defendant Monarch argues that it was excused from liability for contacting Ms. Green, even though she was represented by counsel as to her Bank One debt, because it lacked actual knowledge of her attorney representation, see, Dkt. 128, p. 19-20. Courts, however, have consistently held that attempts to collect debts directly from consumers when the collector knows that the consumer is represented by counsel

24

violate §1692c(a)(2) of the FDCPA, see, Gburek v. Litton Loan Servicing, 614 F.3d 380, 386-387; see also, Zaborac v. Mutual Hosp. Serv., 2004 U.S. Dist. LEXIS 22816, at *[4-8] (S.D. Ind. Oct. 7, 2004)[5]; see also, Geiger v. Creditors Interchange, 59 Fed. Appx. 803, 804 (6th Cir. 2003).

Here, Interim, the creditor, knew that Ms. Green was represented by counsel and, in fact, noted the name and contact information for her attorney in its collection notes, see, Dkt. 128 at ¶ 7-8. Furthermore, Ms. Green's prior lawsuit — a matter of public record — should have told Monarch that she was represented by counsel as to the alleged Bank One debt, see, Dkt. 128 at ¶ 3. Finally, Monarch, which designed the loading protocol for obtaining information about the debts it collected for the portfolio at issue, had the ability to request information about attorney representation, see, Dkt 128 at ¶ 15. Monarch, therefore, knew or should have known that Ms. Green was represented by counsel when it communicated directly with her in attempt to collect a debt, via letter on February 8, 2013, and phone call on February 28, 2013, see, SMF at ¶¶ 21-23, 29-31, and, thus, Monarch's Motion for Summary Judgment as to Defendant's violation of §1692c(a)(2) should be denied.

Defendant Monarch also argues that Ms. Green has not suffered any actual damages -- because she has presented no expert testimony, see, Dkt. 128, pp 21-25, and that thus, this Court should reconsider it denial of Monarch's motion to dismiss for lack of jurisdiction, based on Monarch Rule 68 offer of judgment. This is simply nonsense. Ms. Green testified at length in her deposition and to the emotional distress

---

[5] Zaborac ultimately held that the collector's violation of §1692c(a)(2) of the FDPCA was subject to a bona fide error defense as to its "misunderstanding" or "misinterpretation" of the law. The United States Supreme Court, in Jerman, 559 U.S. 573, 594, later held that mistakes of law are not subject to the bona fide error defense.

she suffered as the result of Defendant's collection actions, see, Dkt. 128-1 at p. 72, ln. to p. 79, ln. 1, and this is evidence from which a jury could conclude that she is entitled to actual damages.

Moreover, as has been held on multiple occasions, it is reasonable for a jury to award actual damages on the basis of emotional distress without expert testimony, see, Anderson v. Specified Credit Ass'n, 2011 U.S. Dist. LEXIS 62410 at *7-8 (S.D. Ill. 2011) (finding a Plaintiff's demand of $1,750 for emotional damages without expert testimony reasonable); Clodfelter v. United Processing, Inc., 2008 U.S. Dist. LEXIS 83791, *12-13 (C.D. Ill. Sept. 12, 2008) (finding that actual damages for emotional distress resulting from a collector's intentional misconduct were appropriate, despite the consumer's lack of expert testimony); see also, McCollough, 637 F.3d at 958 (awarding $250,000 in emotional distress damages for a collector's intentional violations of the FDCPA); Chiverton v. Fed. Fin. Group, 399 F. Supp. 2d 96, 102 (D. Conn. 2005)(awarding emotional distress damages on the basis of plaintiff's testimony alone in the amount of $5,000); Teng v. Metropolitan Retail Recovery, 851 F. Supp. 61, 68-69 (E.D.N.Y. 1994) ("[W]e believe that violations of the FDCPA, by their very nature, (e.g., abusive, deceptive or unfair debt collection practices), are those kinds of actions which may be expected to cause emotional distress and, therefore, the availability of damages for such distress is of paramount importance.")(internal citations omitted)[6].

---

[6] Defendant lists no less than eleven cases which it alleges all hold that emotional distress claims, or claims for actual damages in general, require corroboration by expert testimony, see, Dkt. 128, pp 21-25.  Many of these cases did not involve unlawful collection of a consumer debt, see, Schmaltz v. Norfolk & W. Ry., 896 F. Supp. 180, 182 (N.D. Ill. 1995); Lewis v. CITGO Petroleum Corp., 561 F.3d 698, 707 (7th Cir. 2009). Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999) Musser v.Gentiva Health Services, 356 F.3d 751, 754 (7th Cir. 2004) Aiello v. Providian Fin. Corp., 239

Defendant Monarch argues that this Court should reconsider the prior decision in this matter which denied Monarch's Motion to Dismiss for lack of subject matter jurisdiction, and find in its favor due to Monarch's own conclusion about Ms. Green's actual damages, see, Dkt. 128 at pp. 21-25. As the Seventh Circuit recently held in Smith v. Greystone Alliance, 2014 U.S. App. LEXIS 21529 (7th Cir. Ill. Nov. 13, 2014)[7], however, an FDCPA class action case involving a similar claim for actual damages and a defendant's Rule 68 offer of judgment, a defendant cannot make an offer, have part of the merits decided, and then request the suit be dismissed for want of jurisdiction because a larger offer had been made, see, Smith, 2014 U.S. App. LEXIS 21529, at p. 3-4. As the Court explained:

> If the plaintiff asks for the moon, only offering the moon extinguishes the controversy … A defendant cannot have the suit dismissed by making an offer limited to what it concedes the plaintiff is entitled to receive, even if the defendant happens to be right about its view of the plaintiff's entitlement, because deciding that entitlement resolves the merits.

Smith, 2014 U.S. App. LEXIS 21529, at *4; see also, Gates v. Towery, 430 F.3d 429 (7th Cir. 2005)(holding that  jurisdictional dismissal is proper only if the defendant offers more than the plaintiff's demand.)

Here, as in Smith, Monarch made a Rule 68 offer of judgment in the amount of $1,500—which is less than the amount she has demanded (Dkt. 16, 26).  Moreover, the

---

F.3d 876, 880 (7th Cir. 2001); Cruz v. INS, 871 F. Supp. 1049, 1050, n.2 (N.D. Ill. 1995).  Insofar as Defendant relies on cases that have required expert testimony for actual damages for consumer collection cases, these conflict with the better reasoning of the cases cited by Plaintiff, see, Clodfelter, 2008 U.S. Dist. LEXIS 83791, *12-13; see also,  McCollough, 637 F.3d at 958; Chiverton, 399 F. Supp. 2d 96, 102; Teng, 851 F. Supp. 61, 68-69.

[7] Defendant's motion relies on the District Court's opinion, Smith v. Greystone Alliance, 2014 U.S. Dist. LEXIS 36512, *7 (N.D. Ill. Mar. 20, 2014) (Dkt. 128 at p. 25), which was reversed.

merits of Ms. Green's claim for actual damages are to be evaluated by a jury at trial, not by a court on a motion, see, Smith, 2014 U.S. App. LEXIS 21529, at *4.  Therefore, in light of the Appellate Court's holding on this issue in Smith, this Court need not revisit its prior holding regarding Defendant's motion to dismiss for lack of subject matter jurisdiction.

Ms. Green has testified that she experienced emotional and physical distress as a result of the communications she received from Defendant Monarch, see, Dkt. 128-1 at p. 26, ln. 22 to p. 27 at ln. 18; p. 32, lns. 1-9; p. 72, lns. 3-10; p. 75, lns. 3-10. Specifically, Defendant's illegal collection activity caused Ms. Green to experience irritability and embarrassment when discussing the matter with her spouse, see, Dkt. 128-1at p. 76, ln. 5 to p. 77, ln. 22, and to experience painful, uncomfortable flare-up of her ulcer -- a physical condition widely known to be exacerbated by stress, see, DeCorte v. Jordan, 497 F.3d 433, 442 (5th Cir. 2007) (emotional harm may also manifest itself as depression, emotional distress, loss of self-esteem, excessive fatigue, nervous breakdown, ulcers, gastrointestinal disorders, hair loss or headaches). Moreover, the irritability and strain on Ms. Green's relationship with her husband that Monarch caused Mrs. Green is apparent from the recordings of its collection telephone calls, see, Group Exhibit A.  Summary judgment for Defendant as to Ms. Green's individual claim must be denied.  The jury in this matter is entitled to hear from Ms. Green about the emotional stress Monarch caused her, and decide what amount to award Ms. Green.

## CONCLUSION

Defendant's form debt collection letter violated § 1692g(a)(2) of the FDCPA

because it failed to state the name of the creditor to whom the debt was owed, and violated § 1692e of the FDPCA because it falsely identified DHC as the creditor. Moreover, by attempting to collect debts that were time-barred, Defendant Monarch also violated §1692e of the FDPCA.  As to Ms. Green, Defendant's collection actions also violated §1692c(a)(2) of the FDCPA --  contacting her despite representation by counsel -- and caused her emotional distress.  Defendant's Motion for Summary Judgment must be denied.

Eva M. Green, individually and on behalf of all others similarly situated,

By: /s/ David J. Philipps_____
One of Plaintiff's Attorneys

Dated:  November 24, 2014

David J. Philipps     (Ill. Bar No. 06196285)
Mary E. Philipps     (Ill. Bar No. 06197113)
Angie K. Robertson (Ill. Bar No. 06302858)
Philipps & Philipps, Ltd.
9760 South Roberts Road, Suite One
Palos Hills, Illinois 60465
(708) 974-2900
(708) 974-2907 (FAX)
davephilipps@aol.com
mephilipps@aol.com
angiekrobertson@aol.com

Steven J. Halbert     (Ind. Bar No. 14254-02)
11805 N. Pennsylvania Street
AmeriCenters Building
Carmel, Indiana 46032
(317) 706-6762
(317) 706-6763 (FAX)
Shalbertlaw@aol.com

## CERTIFICATE OF SERVICE

I, David J. Philipps, an attorney, hereby certify that on November 24, 2014, a copy of the foregoing **Plaintiff's Response To Defendant's Motion For Summary Judgment** was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


Paul Gamboa                          pgamboa@gordonrees.com
Gordon & Rees LLP
One North Franklin Street
Suite 800
Chicago, Illinois 60606



/s/ David J. Philipps_____

David J. Philipps     (Ill. Bar No. 06196285)
Philipps & Philipps, Ltd.
9760 S. Roberts Road
Suite One
Palos Hills, Illinois 60465
(708) 974-2900
(708) 974-2907 (FAX)
davephilipps@aol.com